## A. A. EARLE v. WM. W. GROUT.

### Privileged Communications.    Principal and Agent.

In order to make communications to counsel privileged, they must be made to them confidentially, as counsel; the relation of attorney and client must exist at the time; and the communication must be made for the purpose of obtaining advice in regard to legal rights. A general retainer in the matter as to which advice is sought, is not necessary; but the attorney must be counsel in that matter, and the communication made to him as such.

The facts that make communications privileged, must be proved, and the burden lies on him who seeks to exclude them as evidence because they are privileged.

The declarations of an agent are admissible against his principal, if made in the execution of his agency; but not, if made afterwards.

ASSUMPSIT upon an alleged contract on the part of the defendant to act as the plaintiff's agent in the purchase of the St. Johnsbury *Times*, a newspaper published at St. Johnsbury. Breaches, that the defendant purchased said paper for himself, and not for the plaintiff; that the defendant and one G. B. Bullard purchased it together; and that the defendant assisted the said Bullard to purchase it. Plea, the general issue, and trial by jury, June term, 1873, Ross, J., presiding.

On trial it appeared that in 1870, one E. L. Hovey was the proprietor of a newspaper printed at St. Johnsbury, called the St. Johnsbury *Times*, and that the plaintiff, during the summer of that year, was negotiating with said Hovey for the purchase of said paper; that said Bullard had talked of taking an interest in said paper in connection with said Hovey, L. B. Harrington, and A. Ropes, and also that said Bullard and Harrington had talked and speculated about purchasing the paper together; that the plaintiff and the defendant resided at that time at Barton, the plaintiff being an editor, and the defendant a lawyer, and that their relations were intimate and friendly. The plaintiff testified in substance that about August 1, 1870, the defendant agreed to assist him in his negotiations for the purchase of said paper, and to act as his agent and attorney in that behalf. This the defendant denied, and called several witnesses whose testimony tended to show, that before this suit was brought, the plaintiff, on various

16

occasions, complained of the defendant in regard to the sale of said paper; that the defendant had treated him meanly, and had gone back on him, but did not claim on such occasions that the defendant specially agreed to help him, or that the plaintiff had specially employed the defendant to help him in the purchase of the paper; and among the witnesses thus called, was J. B. Robinson, an attorney residing at Barton, by whom the defendant offered to prove that the plaintiff had admitted to him that the defendant was not employed to act as his attorney and agent in the matter. On cross-examination of the plaintiff, his attention was called to a conversation with Robinson, and he admitted that he had never employed Robinson in this suit. Robinson testified as follows: " I never understood Mr. Earle consulted or retained me in this matter. I have done collecting for him. He has discussed his matters with General Grout, fully. We had conversation both before and after he bought the *Times*. It was after he began to complain of the general. Can 't state the substance of some things he said. Think along at first he did n't claim any legal liability of the general, but that he had betrayed him." The plaintiff objected at this point to the witness being allowed to testify. The witness proceeded to state : " I never understood I was counsel, or to be counsel in this matter. He talked over his matter with Grout, and discussed with me Grout's liability. This was in my office. I was doing his collecting, generally, and he had consulted me about other matters." The above is all of Robinson's testimony bearing upon his relation to the plaintiff as counsel in this matter. The plaintiff objected to the witness testifying to what the plaintiff told him upon this point of employment, on the ground that it was privileged, and the court excluded the evidence ; to which the defendant excepted.

It also appeared, that on the Thursday or Friday next preceding August 27, 1870,—which was Saturday—the plaintiff informed the defendant that he had about concluded to trade with Hovey for said paper at $6000 ; that he was to pay $1000 down, and give his notes for $5000 ; that if it was a trade, Hovey was to let him know by letter the Saturday night then next—August 27— and that if Hovey wrote him he could have the office, he wanted

the defendant to go to St. Johnsbury on the Monday following, and sign his notes and make writings. Defendant admitted this, and testified that he told plaintiff that if Hovey let him have the office, he would go to St. Johnsbury, make the writings for its transfer, and sign plaintiff's notes.

It appeared from the testimony of said Hovey and Bullard, witnesses called for the defendant, that on said Saturday, Hovey sold said office to said Bullard at the same price the plaintiff was to have paid for it, and with the same terms of payment, except that Bullard bought certain accounts due the office for subscriptions and advertising, which were not included in his trade with the plaintiff, although the plaintiff testified he told Hovey he would buy the accounts, but no price was agreed upon. The plaintiff admitted that he received no letter from Hovey on Saturday night, and had no occasion for the defendant to go to St. Johnsbury on Monday.

The plaintiff claimed that the defendant bought the office of Hovey, either himself or through Dr. Bullard, or that he was somehow interested in the original purchase from Hovey, just how or in what manner he did not claim to define. He also claimed that Dr. Bullard was the agent of the defendant to manage the paper and conduct it editorially, and, more particularly, that he was his agent to employ said Harrington to assist in the management of the paper editorially, and it appeared that Harrington was connected with the paper about ten weeks, as one of the editors and proprietors. Upon this point Hovey testified in substance, that he sold the office to Dr. Bullard, and did not in any way know the defendant in the transaction, except as he made the bill of sale and signed notes, as hereinafter stated, and that he sold to Bullard, because in his trade with him, he sold accounts, and also because he preferred to have the paper fall into Bullard's hands. Bullard testified in substance, that previous to closing his trade with Hovey—August 27—he and the said Harrington had talked of buying the paper together, and also with other parties. Harrington admitted that he and Bullard had speculated about buying the paper together, both before and after the sale by Hovey, but that on his part it did not go beyond speculation, as he had

not the funds to buy with. Dr. Bullard further testified that on Saturday, August 27th, he learned from L. W. Rowell, who was foreman in the office with Hovey, that Hovey was about selling to Earle, and thereupon proceeded to make a trade with Hovey.

It appeared from Hovey's testimony, that he should have let Earle have the office, and should have sent him a letter Saturday night,—in fact that he had one written,—if Bullard had not taken it. It appeared from Harrington's testimony and from Bullard's, that if the plaintiff had the office, the defendant was to sign his notes and make the writings, and that Hovey asked for a signer on Bullard's notes, and told him that the defendant's name on said notes would be satisfactory to him, and that Bullard said that he thought that he could get the defendant to sign his notes, and that, at Bullard's request, the defendant came to St. Johnsbury on the following Monday, and drew the bill of sale. It further appeared that the defendant signed the five $1000 notes given for said office, first, which came about, as the defendant's, Hovey's, and Bullard's testimony tended to show, as follows : after the bill of sale was completed, Bullard and Hovey stepped into an adjoining room, and were taking an account of some job stock, and while there the defendant drew the notes, and it being about train time, signed them and left them upon the table and went home on the train, and that when Bullard signed, he wrote his name after that of the defendant. None of the notes were produced on trial, and it did not appear whether there was a space for Bullard to sign above the defendant's name or not. It appeared that the $1000 paid down was taken from the bank on that day, and a note given for it, which the defendant did not sign; and that on a subsequent day, Dr. Bullard gave said Hovey a note for eleven or twelve hundred dollars for the accounts, which the defendant did not sign.

The defendant and the said Bullard both testified, that at the time of the sale by said Hovey on the 27th August, the defendant had no interest, direct or indirect, in said office, but that on the last of September, 1870, the defendant did become interested therein in the following manner. The defendant claimed, and his testimony tended to show, that Theophilus Grout, who had partly

learned the printer's trade, and who had just then commenced the study of law, became desirous of obtaining an interest in said office, and through his brother, the defendant, arranged with Dr. Bullard for one half of the office at cost, and that this arrangement was completed the last of September; that it was to be a sale from Bullard to the defendant, who was to let his brother Theophilus have it at the same price ; that the property was to pass through the defendant, that he might retain a lien upon it, for the reason that Theophilus was without pecuniary means, and in his arrangement with Bullard, the defendant was to back him. The defendant's testimony tended to show that he closed the trade with Bullard the last of September, and at that time, as between Bullard and himself, became jointly liable with him on the five $1000 notes given, August 27, and was to help take care of a bank note for $1000 given the same day, and the note for eleven or twelve hundred dollars given for accounts as aforesaid. The defendant's testimony all tended to show that this agreement between himself, Dr. Bullard, and Theophilus, all rested in parol, and that no minute, memorandum, or writing was ever drawn in regard to the same. Theophilus's testimony further tended to show, that about the time the trade was concluded with Bullard as aforesaid, and on September 23, he received an appointment in the custom-house at Newport for thirty days, at $2.50 per day, which he wished to complete, and that he could not come forward and take charge of said paper. The defendant's and Bullard's testimony tended to show -that when the defendant arranged for the purchase of one half for Theophilus, it was understood between them, that Bullard and Harrington should continue in said paper until such time as Theophilus could come into the office. The defendant also testified that afterwards, about the 18th of October, he had conversation with Bullard and Harrington, in Harrington's store, and told Harrington to continue in the office until Theophilus could take charge, and he would make it right with him. It further appeared, that before Theophilus's thirty-day appointment expired, the plaintiff became very anxious to purchase the paper, and through E. D. Hopkins made several offers to the said Bullard for said office, and, finally, about November 6 or 7, offered the sum of

$8000. The evidence tended to show that Theophilus's appointment expired October 23. The defendant's evidence tended to show that some time the last of October, Dr. Bullard sought to be released from his contract with the defendant; that at first he tried to have the defendant give up the contract; but, failing in that, finally, on the 4th of November, gave the defendant his note for $500 to relinquish his claim, and the claim of Theophilus, to said office, and that this was done without consulting Theophilus—one half of which defendant gave Theophilus—and that at the time the defendant relinquished his claim, it was agreed between the defendant and Bullard, that if Bullard should sell so that he made more than $500 for himself, the surplus should be divided equally between them. The testimony tended to show that at this time Bullard professed to want said office to keep, and not to sell. Afterwards, on the 8th of November, Bullard sold to the plaintiff, for the sum of $8000. The defendant's testimony tended to show that after that, on January 10th, 1871, the defendant and Bullard had some high words about this transaction, and the defendant requested, and after a delay of several days, the said Bullard gave him the following writing, which both parties put into the case:

" This is to certify that I, G. B. Bullard, am to pay five certain promissory notes heretofore given E. L. Hovey for the *Times* printing-office, each for the sum of $1000, one of which notes is now in the St. Johnsbury bank; and all of which notes are signed by myself and W. W. Grout, it being that said Grout is only surety on said notes, that they belong to me to pay, which I agree to do and save the said Grout harmless therefrom. I also agree that after saving for myself the sum of five hundred dollars, and after paying the said Grout a certain promissory note for $500, given the said Grout at Montpelier the last of October or first of November, 1870, for relinquishing his claim and the claim of Theophilus Grout on said office, by virtue of a contract heretofore had for one half of said printing-office, and after paying all the bills that have accrued in the purchase and running of said office, and after deducting also the interest on six thousand dollars from 29th day of August, 1870, together with the above sums, from $9500, the amount paid me by A. A. Earle for said office and accounts, then whatever sum may be left over $7200, the amount which I gave Hovey, I agree to divide equally with the

said Grout, but not until the said Earle shall have paid the whole of said $9500. The above mentioned five hundred dollar note to be paid on demand.

St. Johnsbury, January 10, 1871.

G. B. BULLARD."

It further appeared that afterwards, in the latter part of the winter, or in the spring of 1871, the defendant paid the said Harrington the sum of $25. The defendant testified in substance, that Harrington met him in the street and made complaint to him that Earle, who had then come into possession of the office, was collecting of him for certain advertising which he had in said paper while connected with it as aforesaid, and also complained that he had not been fully compensated for the time he was connected with said paper, and that the defendant asked him what would satisfy him, and that Harrington said he would leave it to the defendant, and that defendant, a little after that, handed him $25 and asked him if that was satisfactory, and he said it was. Harrington testified in substance, that after the sale by Bullard to Earle, he went one night to Bullard's house, at Bullard's request, and there figured up for Bullard, and according to this figuring, Bullard was not going to make anything, and there was some doubt whether he ought to ask anything for his (Harrington's) services; that afterwards Bullard paid him $155; that some time about this time, he met the defendant and asked him if he had seen Bullard; that the defendant looked up and asked him why; that he commenced to say something about the figuring, and then was fearful he might get his foot in it, and began to suspect he was being made a tool of, and stopped; that afterwards the defendant came into his store and handed him $25. He admitted he might have complained to the defendant about the advertising; but said that he told the defendant he had been fully settled with, and had no claim on any one; but when the defendant offered him $25, he said he would take it as a present, and that he so took it.

Before the plaintiff testified, and before the defendant, or Bullard, or Hovey, or Theophilus Grout, had testified, the plaintiff called the said Harrington as a witness, and offered to prove what Bullard said to him just after the sale by Hovey, and prior to the

time when the defendant admitted he had an interest in said pa-
per, on the ground that Bullard was the defendant's agent.   The
defendant objected to the admission of the sayings of Bullard un-
til Bullard had testified, and because there was no evidence that
Bullard was the defendant's agent.   But the witness testified as
follows:  "There was one time when Bullard and Grout were in
my store.   Dr. Bullard at that time urged Grout to come out and
take his paper, for he had got tired of it, and I heard Grout put
him off, and said he wanted we should keep along till after the,
session of the legislature.   Afterwards, Grout paid me some
money ;" and on the plaintiff's counsel saying they expected to
introduce other testimony showing Bullard was the defendant's
agent, the court overruled the objection, and the witness was al-
lowed to testify, in substance, that Bullard told him on the Mon-
day or Tuesday following the sale by Hovey—August 27—that
Grout had bought the paper, and wanted the witness to assist in
editing it; and under objection, the witness was allowed to further
testify to numerous other sayings and doings between himself and
the said Bullard, for the purpose of showing that the defendant
had an interest in said office from August 27 ; to all which the
defendant excepted.

When defendant took the stand, he testified that Bullard was
not his agent to manage the *Times,* or to employ Harrington, until
the arrangement was entered into the last of September, by which
Theophilus was to have one-half of said office as aforesaid, and
that then he was.   Bullard testified to the same.   It did not ap-
pear that the defendant had but one interview with Bullard and
Harrington, in Harrington's store ; nor did it appear that the de-
fendant paid the said Harrington any money but said $25.   The
plaintiff gave evidence besides that of Harrington's, tending to
show that Bullard, Hovey, and the defendant, had said and done
things out of court which contradicted their testimony on the stand,
and impeached them generally.   He relied upon the writing of
January 10, 1871, and upon various circumstances and acts of the
defendant and Bullard, as tending to show that the defendant had
an interest in said purchase when it was made by Bullard of Hovey,
and that he would be likely to make Bullard his agent to employ

said Harrington. The defendant requested the court to charge, that the testimony of Harrington, as to what Bullard told him about the defendant's owning the *Times*, was not evidence in chief against the defendant—though Bullard actually told him so—unless the jury first found that Bullard was in fact the agent of the defendant; and that there was no evidence in the case to establish such agency; that what Bullard may have said to Harrington, was no evidence of the fact of agency; that the jury must first find, independently of anything Bullard might or might not have said, that Bullard was in fact the defendant's agent to employ Harrington to edit the paper at the time he was first employed, and that unless they so found, the only effect Harrington's testimony could have, was to contradict Bullard; and that upon the question of agency, the burden was upon the plaintiff, and that all the direct evidence was, that Bullard was not the defendant's agent; but that the plaintiff relied solely upon circumstances to prove it. The court did not tell the jury that there was no proof to establish agency, but submitted it to them to find how that fact was; but did tell them that they must find the fact independently of anything that Bullard might or might not have said.

The defendant *pro se*, with whom was *Powers*.

The testimony of Robinson was improperly excluded. The plaintiff himself admits that he never employed Robinson in this matter; and Robinson said he never understood he was retained, or was counsel, or to be counsel in it. In short, there is nothing in the case looking towards the relation of attorney and client. What the plaintiff said to Robinson is not privileged, unless that relation existed, and the communication was made *under* that relation, for the purpose of professional advice. *Dixon* v. *Parmelee*, 2 Vt. 185; *Holman* v. *Kimball*, 22 Vt. 555; *Wetherbee et al.* v. *Ezekiel*, 25 Vt. 47; *Thompson* v. *Kilburn*, 28 Vt. 750; *Coon, adm'r.* v. *Swan et al.* 30 Vt. 6; *Hoffman* v. *Smith*, 1 Caines, 157; *Wilson* v. *Rastall*, 4 T. R. 753; *Brandon* v. *Goding*, 7 Rich. (S. C.) 459; *Foster* v. *Hall*, 12 Pick. 97.

The declarations of Bullard to Harrington should have been excluded. The introduction of *declarations*, upon an offer to sup-

17

plement them with proof that will thereafter make them admissible, is error. The main facts must first be shown, and the court cannot remedy the mischief by instructing the jury to disregard them. The declarations of an agent are only admissible when they accompany some *act* within the scope of the agency. If they relate to any matter not within the *scope of the agency*, they are not admissible. The declarations of an agent made subsequent to the business for which he is appointed agent, are not admissible. *Austin* v. *Chittenden,* 33 Vt. 553. The agency of Bullard, if any existed, was to buy the *Times.* This was the plaintiff's claim. His declarations must be made *while doing some act* in that purchase, in order to be admissible. The sale took place some time before the declarations were made to Harrington; and further, the declarations related to another business.

There was no evidence tending to show that Bullard was the agent of defendant at time of sale by Hovey, August 27. There is no legal evidence that the defendant had anything to do with the office till the last of September. There is nothing in Harrington's testimony, legally considered, that *tends* to connect the defendant with the sale of August 27. The circumstances which the plaintiff relies upon to establish the fact of agency, are as consistent with *no* agency, as with agency, and thus, as proof, amount to nothing. These circumstances are all detailed in the exceptions, and constitute the whole proof upon this point. Granted, that these circumstances are *consistent* with agency, that does not make them proof *tending* to show that relation. To be *proof* of that fact, they must have a *positive tendency* that way. They must be *inconsistent* with *no agency.* Because plaintiff's counsel claimed that these circumstances tended to show agency, is no reason why they should be submitted to a jury. Counsel might claim the wildest things; and, if apt at making " the worse appear the better reason," might win from the jury the wildest findings. It is, therefore, the duty of the court, to interpose a wise, judicial scrutiny, and withhold from them all issues that have no legal evidence to support them. To neglect this, is error. *Birney* v. *Martin et al.* 3 Vt. 236; *Manwell* v. *Briggs,* 17 Vt. 176.

*A. M. Dickey*, for the plaintiff.

That the communications of the plaintiff to the witness Robinson, were of such a character, and made at such a time, as to protect them from disclosure by the witness, I assume will not be questioned; for it is well settled at the present day (although the contrary has been held), that this privilege of the client is not confined to those cases only where he has employed the attorney in a suit or cause, but extends to all such communications as are made by him to the attorney in his professional character, and with reference to professional business. 1 Phil. Ev. 134; *Foster v. Hall et al.* 12 Pick. 89; 1 Greenl. Ev. § 240; *Cromack v. Heathcote*, 2 Brod. & B. 4; *Doe d. Shellard v. Harris*, 5 C. & P. 592; *Pearse v. Pearse*, 11 Jur. 52, cited in 1 Greenl. Ev. § 240, note 5.

But the question is, were the communications made to the witness in his professional character, for the purpose of obtaining professional advice upon the subject of the plaintiff's rights and the defendant's liability? The exceptions state that " the plaintiff admitted, on cross-examination, that he never employed Mr. Robinson in this suit; " the fair construction of which is, not that he never consulted him in regard to the subject-matter thereof; but that he never employed him to conduct or assist in the suit after it was commenced. The witness testified that he " never understood that the plaintiff consulted or retained him in this matter; " but says that the plaintiff " discussed " the defendant's liability with him, in his office, at a time when he was doing "his collecting generally." The fair construction of this is, that the plaintiff advised with the witness, in his professional character, as to the defendant's liability; and under the circumstances, and the relation then existing between the plaintiff and the witness, it was not necessary that there should have been a distinct retainer as to that particular matter; for Robinson was the plaintiff's general collecting attorney at the time, and the plaintiff might well suppose he was " discussing" the matter with him as his attorney, and in his legal capacity; and if that be so, it satisfies the rule. *Wetherbee et al.* v. *Ezekiel*, 25 Vt. 47; *Coon, adm'r.* v. *Swan et al.* 30 Vt. 6.

Indeed, no retainer or employment whatever is necessary, in order to protect the communication, if it is made to the attorney in his professional capacity; for in *Cromack* v. *Heathcote, supra,* an attorney, being requested to draw an assignment of goods, refused, and the deed was drawn by another. The validity of the deed being afterwards questioned on the ground of fraud, in an action against the sheriff, in which the attorney first applied to was not employed, it was held that the communication made to this attorney was professional, and consequently privileged. In *Coon, adm'r.* v. Swan *et al., supra,* the attorney acted simply as a neighbor, and not in his professional capacity; and in *Thompson* v. *Kilborne,* 28 Vt. 750, the plaintiff was "given to legal reflections," and *fished* the attorney to fortify a predetermination of his own, but sought no advice by which to regulate his future conduct. The evidence in the case at bar tends, at least, to show that the communication was professional, and the county court must have found that it was so, else they would not have exc'uded it, and that finding is conclusive.

It was not error for the court to permit the witness Harrington to testify to Bullard's admissions, before proof of his agency, provided the court believed that the plaintiff, in good faith, intended to subsequently introduce testimony to prove such agency. Such is the common practice. And whether such agency was subsequently established or not, Harrington's testimony in that respect became and was material for the purpose of contradicting Bullard; and the defendant did not object to it for that purpose, but, on the contrary, admitted and treated it admissible for that purpose, by his request that, "unless the jury find the fact of agency, the only effect Harrington's testimony has is to contradict Bullard." *Jenne* v. *Joslyn,* 41 Vt. 478. The defendant requested the court to charge, "that the testimony of Harrington as to what Bullard told him about the defendant's owning the *Times,* is not evidence in chief against the defendant—though Bullard actually told him so—unless the jury find that in fact Bullard was the defendant's agent," etc. The exceptions do not show whether this part of the request was complied with or not; hence this court will presume that it was; for error must be shown by the exceptions, or

the judgment below will stand.    *Bartlett* v. *Wood et al.* 32 Vt. 372.

The court charged as requested, that the fact of agency must be proved independently of anything Bullard did or did not say; and left the fact of agency to the jury to find upon the proof.   In this there was no error, for the proof clearly tended to establish such agency; although the question depended upon a general inference from a multiplicity of particular facts, some of which are detailed in the bill of exceptions.

The opinion of the court was delivered by

REDFIELD, J.   I.   J. B. Robinson was produced by the defendant as a witness, and excluded by the court, on the ground that Robinson had become possessed of the facts he was to give in evidence, confidentially, as the attorney of the plaintiff.   The defendant testified that he had never employed Robinson as his attorney in this suit.   And Robinson testified that " he never understood he was counsel, or to be counsel, in this matter.   He talked over his matter with Grout, and discussed with me Grout's liability.   I was doing his collecting generally.   He had *consulted* me about *other* matters."   The burden is upon the party who seeks to have his statements suppressed as evidence, because they are *privileged* communications.   The facts that would make them so, must be proved.   The general rule is, that a witness, called upon the stand, is bound to tell the whole truth.   The communication, to be privileged, must have been made to the witness confidentially, as his counsel; the *relation* of counsel and client must have existed at the time, and the communication made for the purpose of obtaining counsel, advice, or direction, in regard to his legal rights.   It is not required that the witness should have been retained generally in the matter upon which the party was seeking advice; but he must have been counsel upon the subject upon which the conference was had, and the communication made to him as such.   The evidence, so far as it is stated in the exceptions, tends to show that the witness did not regard that the communication was made to him as counsel; nor is there any evidence that the plaintiff understood at the time that he was consulting,

confidentially, his counsel. We think it does not affirmatively appear that the communication was privileged, and that the exclusion of the witness Robinson was error.

II. Harrington, against the defendant's objection, was admitted to testify that Bullard said to the witness that "Grout had bought the paper;" and also stated many other things tending to show that defendant was interested in the property one or two days after the property was transferred from Hovey to Dr. Bullard. This evidence was admitted on the ground that Bullard (as the plaintiff claimed) was, at the time, the agent of the defendant. The declarations of an agent are admissible, if made in the execution of his agency, but not if made afterwards. *Austin* v. *Chittenden*, 33 Vt. 553. The exceptions state that plaintiff " relied upon various circumstances and acts of defendant and Bullard, to show that defendant had an interest in the purchase when it was made by Dr. Bullard of Mr. Hovey, and that *he would be likely to make Dr. Bullard his agent to employ said Harrington.*"

The exceptions seem to negate that there was any *proof* that defendant had made Bullard his agent to employ Harrington; but rather that the defendant had a secret interest in the property at the time of this purchase; and if that was so, it was "likely" and natural that he would authorize Bullard to employ Harrington for him. The admission of Dr. Bullard's declarations as evidence in chief against the defendant, we think, was error.

Judgment reversed, and cause remanded.